**TISHA PRATER, ANGELICA**
**ROBINSON, SHA-MAR WOODS,**
**KELLY LUCY, JAMAICA SKENDER,**
and **JULIE KRUPINSKI,**

      Plaintiffs,

vs.                                  **CASE NO. 08-CV-14339**

**DETROIT POLICE DEPARTMENT** and the
**CITY OF DETROIT,** *a municipality*, *jointly*      **HON. SEAN F. COX**
*and severally*                            **MAG. JUDGE SCHEER**

      Defendants.
_____

Deborah L. Gordon, PLC
Deborah L. Gordon (P27058)
Sarah S. Prescott (P70510)
Sharon Dolente (P67771)
Cooperating Attorneys, American Civil
  Liberties Union
Attorneys for Plaintiffs
33 Bloomfield Hills Parkway, Suite 275
Bloomfield Hills Michigan 48304
Telephone 248 258 2500
dgordon@deborahgordonlaw.com
sprescott@deborahgordonlaw.com
sdolente@deborahgordonlaw.com

Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Jessie Rossman (admission pending)
Attorneys for Plaintiffs
American Civil Liberties Union Fund
  of Michigan
2966 Woodward Avenue
Detroit, MI 48201
Telephone 313 578 6814
msteinberg@aclumich.org
jrossman@aclumich.org

<u>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

Plaintiffs **Tisha Prater, Angelica Robinson, Sha-Mar Woods, Kelly Lucy, Jamaica Skender,** and **Julie Krupinski** by their attorneys complain against Defendants as follows:

<u>**Nature of Case**</u>

1.  Six female police officers file this lawsuit against their employers, the Detroit Police Department and the City of Detroit, because they unlawfully discriminated against Plaintiffs when they became pregnant in violation of Title VII of the Civil Rights Act and the Equal Protection Clause of the United States Constitution. Plaintiffs bring this case to address a shocking policy and practice adopted by the Detroit Police Department (DPD) under which long-serving officers are forced out of their positions and onto sick leave when they become pregnant—regardless of their ability to perform police duties. In fact, one of the officers, Officer Angelica Robinson, was forced onto sick leave even though she had been working a desk job in the Crime Statistics and Analysis Section for more than five years when she became pregnant and although DPD's own medical experts established that she was fully able to perform her job up to the end of her pregnancy.

2.  Plaintiffs suffered serious consequences as a result of the pregnancy discrimination they faced. The DPD policy places incredible financial burden on these women, including forcing some to rely on Medicaid in order to obtain health insurance and to use food stamps to support themselves. The policy also imposes severe emotional burdens on pregnant officers and hampers their career advancement for years after their pregnancies. The DPD's policy unfairly forces female officers to choose between serving the City and having children.

## Jurisdiction and Venue

3.      This Court's jurisdiction over this matter derives from 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

4.      Venue is appropriate in this Court under 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices giving rise to this action were committed in the Eastern District of Michigan, and the Plaintiffs reside in this District.

## Parties

5.      Plaintiff Prater has been a DPD officer since 2001.  She resides in the Eastern District of Michigan.

6.      Plaintiff Robinson has been a DPD officer since 1995.  She resides in the Eastern District of Michigan.

7.      Plaintiff Woods has been a DPD officer since 2001.  She resides in the Eastern District of Michigan.

8.      Plaintiff Lucy has been a DPD officer since 1999.  She resides in the Eastern District of Michigan.

9.      Plaintiff Skender has been a DPD officer since 2000.  She resides in the Eastern District of Michigan.

10.     Plaintiff Krupinski has been a DPD officer since 1996.  She resides in the Eastern District of Michigan.

11.     Defendant DPD was and is an agency of Defendant City of Detroit and employs Plaintiffs.

12.     Defendant City of Detroit was and is a Michigan Municipal Corporation located in southeastern Michigan.  Defendant City operates, manages and controls Defendant DPD.

## Facts

13.     DPD is responsible for policing the City of Detroit, Michigan.  DPD is divided into six Districts.

14.     According to the most recent Federal data collected, DPD employs approximately 3,000 officers, of whom approximately one-quarter are female.

15.     Approximately half of DPD's sworn officers respond to calls for service; remaining personnel may rarely or never be called on to respond to the public.

16.     DPD routinely places its officers on light duty assignments.  It is estimated that for each shift staffed at DPD, up to 300 light duty positions are available over its six Districts.

17.     Light-duty assignments involve a reduced risk of confrontation with civilians and a low degree of physical exertion.

18.     Light duty jobs are not "make work" jobs, but include such duties as serving as the precinct desk officer, crossing guard supervision, vehicle maintenance, suspect booking and processing, police academy instruction, community education instruction, and a wide variety of administrative and investigative positions.

## Policy and Practice Prior to April 2004

19.     Prior to 2004, DPD maintained a longstanding informal policy and practice of ensuring that light duty assignments were provided to officers who had medical conditions or injuries that temporarily prevented them from performing the full range of confrontational police duties.

4

20.     Under this policy, officers who became pregnant were placed in restricted duty positions until they opted to use leave or were required by their own medical professionals to discontinue work to give birth.

21.     On information and belief, scores or hundreds of DPD officers obtained restricted duty assignments under the informal policy and were treated equally as other persons not so affected but similar in their ability or inability to work, whether because of pregnancy, illness or injury incurred either on or off the job.

### Policy and Practice After April 2004

22.     In 2004, the informal policy and practice described above were changed.

23.     The current DPD policy, which has been in effect since 2004, provides that officers who advise DPD of pregnancy are to be treated like officers who incur non-duty related injuries or medical conditions.

24.     As such, when the DPD learns that an officer is pregnant, the officer is placed on unpaid sick leave.

25.     Per the latest policy, pregnant officers are not offered light duty positions, as before, but are to be placed on a waiting list for light duty positions, where seniority determines the order of priority on the list.

26.     While on sick leave, only those officers who have accrued personal or sick time are paid a salary, and this payment continues only until the accrued time is exhausted. Moreover, pregnant officers do not accrue seniority for favorable positions and promotions; they are excluded from testing for future promotions;; and they may be denied certain benefits including health insurance, among other things.

27.     Pursuant to DPD's policy, pregnant officers can be restored to duty after being placed on sick leave only by presenting a doctor's note attesting to the ability to

perform all of the duties of a patrol officer, including "use body force to gain entrance through barriers," "jump down from elevated surfaces," "crawl in confined areas," and "effect an arrest, forcibly if necessary."

28.    However, on information and belief, there are numerous officers working full duty for DPD who are currently unable to perform all of the duties of a patrol officer, and such officers' inability is plainly apparent to DPD supervisors.

## Adverse Effects of Defendants' Policy and Practice

29.    As a result of the DPD policy and practice described above, pregnant women disproportionately suffered a loss of leave time, pay, vacation time, medical benefits and other fringe benefits.

30.    Beyond these immediate losses, relegation to extended unpaid leave directly hinders mobility and advancement for pregnant DPD officers.

31.    This is true because DPD takes into account use of sick and other leave time in determining training opportunities and advancement.

32.    Finally, the losses described above will follow female DPD officers throughout their careers.

33.    This is true because officers on leave do not accrue seniority or longevity.

34.    Furthermore, retirement dates, pension multipliers, vesting and matching benefits are or may be affected by extended, unpaid and unwanted leave.

35.    DPD's refusal to credit pregnant officers with service time when they are willing and able to work and have been forced into unpaid leave therefore significantly burdens their employment opportunities and affects their employment status and will continue to do so in the future.

36.     Beyond the above monetary losses, DPD's policy and practice forces Detroit's public servants to choose between their official duties and beginning families.

## Unfavorable Disparate Treatment

37.     DPD's policy, described above, is not enforced uniformly, and in some instances pregnant DPD officers are subjected to adverse discriminatory treatment that differs from its policy.

38.     In particular, supervisors have taken it upon themselves to question female officers about their reproductive plans and to force female officers to the DPD's medical section in order to uncover pregnancies.

39.     In some such cases, women who had not advised DPD of pregnancy are placed on unpaid leave despite having no signs or symptoms of pregnancy and although they require no work restrictions whatsoever.

40.     By contrast, on information and belief, non-pregnant workers with minor non-duty injuries or illness are not actively sought out and placed on unpaid and unwanted leave.

41.     Certain supervisors also single out pregnant officers for less favorable treatment compared to peers who are injured on or off the job by failing and refusing to maintain a list of all workers seeking light duty positions; these supervisors instead preferentially assign injured workers to light duty (whether injured on or off the job).

42.     In such cases, pregnant officers are treated less favorably than other officers who incur an injury or illness.

43.     In still other cases, female officers already assigned to desk jobs, who are not required to perform physical activities such as effectuating arrests, have been forced onto extensive, unpaid leaves due to pregnancy.

44.     Similarly situated males with desk jobs are not placed on unpaid leave based on illnesses or injuries unrelated to job performance.

45.     Finally, in certain cases, officers facing discipline or even **criminal charges** are placed on restricted duty in preference to pregnant officers who have no such performance issues or blemishes on their record.

### Tisha Prater

46.     Plaintiff Tisha Prater is a twenty-seven year old female.

47.     Plaintiff Prater began working with DPD on March 26, 2001.

48.     At all times, Plaintiff Prater has performed work for DPD in a manner that is satisfactory or better.

49.     In 2003, Plaintiff Prater became pregnant with her daughter. She was permitted to work a full time restricted duty position throughout her pregnancy.

50.     During this time, she fulfilled the duties of a "report officer" in a manner that was satisfactory or better.

51.     Plaintiff Prater then returned to duty following her pregnancy.

52.     In May 2007, Plaintiff Prater again became pregnant.

53.     She did not disclose her pregnancy immediately, for fear of being removed from her position per the new light duty policy.

54.     In July 2007, she disclosed the pregnancy.

55.     Plaintiff Prater supplied Defendants with medical paperwork indicating that she was capable of full time police work.

56.     Nevertheless, she was immediately informed that she would be placed on leave.

57.     Plaintiff Prater was not paid on leave between July and December 2007, when she delivered twins. In fact, Plaintiff Prater suffered substantial loss of pay and benefits throughout the leave period.

58.     On information and belief, DPD's treatment of Plaintiff Prater will adversely affect her chances of transfer and/or promotion in the future.

59.     Plaintiff Prater filed charges with the Equal Employment Opportunity Commission (EEOC) on October 16, 2007.

60.     Plaintiff Prater made clear in her charge that her experience was the result of a comprehensive policy of the DPD and as such affected all pregnant officers at DPD.

61.     EEOC accordingly investigated the policy in place and DPD's treatment of pregnant officers in general.

62.     Plaintiff Prater received a Right to Sue Letter from the EEOC dated July 15, 2008.

**<u>Angelica Robinson</u>**

63.     Plaintiff Angelica Robinson is a thirty-three year old female.

64.     Plaintiff Robinson began working with DPD on November 20, 1995.

65.     At all times, Plaintiff Robinson has performed work for DPD in a manner that is satisfactory or better.

66.     She was assigned to field positions between 1995 and 1998, an investigation unit from 1998 to 2001, and an executive protection unit from 2001 to 2002.

67.     In 2002, Plaintiff Robinson was moved to Crime Statistics and Analysis, a job that requires her to work inside at a desk, and she remained in that position until the events at issue in this complaint.

68.     In early 2008, Plaintiff Robinson's supervisor sent Plaintiff Robinson to DPD's medical section for evaluation based on a rumor that Plaintiff was pregnant.

69.     Plaintiff Robinson was pregnant, but had no visible signs or symptoms of pregnancy, and her pregnancy did not affect her daily work. She had therefore not told co-workers about her pregnancy.

70.     On or about March 20, 2008, at five months pregnant, Plaintiff Robinson was immediately placed on leave.

71.     Plaintiff Robinson thereafter supplied DPD with medical documentation indicating that she "is able to work her full duty current job assignment, without any restrictions."

72.     In fact, DPD's own doctor indicated, "The patient is currently capable to work in her current job position."

73.     Other medical documentation made clear, "the patient is capable of working at her current job position until August 26, 2008" and "a medical leave (absence from work) due to pregnancy is not required until August 26, 2008. The patient (employee) is capable of performing work."

74.     Nevertheless, Plaintiff Robinson was forced to continue on leave.

75.     During her leave, she exhausted approximately 500 accrued hours of sick time so that she could continue receiving pay and benefits and applied for Family Medical Leave benefits to prolong her benefits coverage.

76.     Plaintiff Robinson had been seeking a transfer for job satisfaction.

77.     On information and belief, DPD's insistence on her taking several months of unpaid leave will adversely affect her chances of transfer and/or promotion in the future.

78. Plaintiff Robinson suffered substantial loss of pay and other benefits throughout the leave period.

79. Plaintiff Robinson has considered having more children in the future, but has been discouraged from doing so by the DPD policies and practices.

### Sha-Mar Woods

80. Plaintiff Sha-Mar Woods is a twenty-eight year old female.

81. Plaintiff Woods began working with DPD in 2001.

82. At all times, Plaintiff Woods has performed work for DPD in a manner that is satisfactory or better.

83. In September 2007, Plaintiff Woods became pregnant.

84. She did not disclose her pregnancy immediately, for fear of being removed from her position.

85. Plaintiff Woods was assigned work at a desk and on a cellblock.

86. On or about January 7, 2008, a supervisor indicated that Plaintiff Woods may have been exposed to tuberculosis along with other workers and that she must be medically tested.

87. In fact, no other individuals supposedly "exposed" were sent to the medical section; on information and belief, the suggestion of exposure was a pretext for rooting out suspected pregnancy.

88. At the doctor's examination, Plaintiff was asked if she was pregnant, and she truthfully reported that she was pregnant.

89. Plaintiff Woods was promptly informed that she would be placed on leave.

90. Plaintiff Woods nevertheless reported to work January 7 through January 15, as she was able to work and was hoping for an assignment.

91.   On January 18, 2008, she provided DPD with documentation indicating she was in "good condition" and could continue to work.

92.   Nevertheless, DPD required her to take leave "due to her inability to perform the full duties of a Police Officer."

93.   DPD documentation also indicates that DPD "elected" to not issue restricted duty positions to Woods.

94.   As a result of DPD's "election," Plaintiff Woods was not paid on leave and suffered loss of various benefits and pay.

95.   As a result of being put out of her job and onto sick leave, Plaintiff Woods was forced to apply for welfare and go on Medicaid in order to obtain health insurance for herself and her unborn child.

96.   On information and belief, DPD's conduct will adversely affect her chances of transfer and/or promotion in the future.

97.   Plaintiff Woods has considered having more children in the future, but has been discouraged from doing so by the DPD policies and practices.

**Kelly Lucy**

98.   Plaintiff Kelly Lucy is a twenty-nine year old female.

99.   Plaintiff Lucy began working with DPD in August 1999.

100.  At the time of her hire, Plaintiff Lucy understood that women at DPD were not forced to choose between work and family, and could be assigned to light duty in the case of pregnancy.

101.  At times relevant here, Plaintiff Lucy was assigned to Armed Robbery Breaking and Entry Special Operations.

102. At all times, Plaintiff Lucy has performed work for DPD in a manner that is satisfactory or better.

103. In February 2008, Plaintiff Lucy voluntarily reported to DPD that she had become pregnant, assuming that she would be placed on a light-duty assignment.

104. Instead, Plaintiff Lucy was placed on leave on the same day she reported the pregnancy.

105. Plaintiff Lucy applied for unemployment benefits, but was denied pending use of all of her sick time.

106. Plaintiff Lucy was not paid on leave after her sick time was used.

107. Plaintiff Lucy also was not eligible to take a promotional examination during her leave because she was on the leave.

108. As a result of DPD's actions Plaintiff Lucy suffered substantial loss of benefits and pay.

109. On information and belief, this time off will further adversely affect her chances of transfer and/or promotion in the future.

## **Jamaica Skender**

110. Plaintiff Skender is a twenty-nine year old female.

111. Plaintiff Skender began working with DPD in April 2000.

112. At times relevant here, Plaintiff Skender was a patrol officer assigned in DPD's Northwest District.

113. At all times, Plaintiff Skender has performed work for DPD in a manner that is satisfactory or better.

114. In March 2008, Plaintiff Skender reported to her time-keeping supervisor that she had become pregnant and was immediately placed on leave.

115.    Plaintiff Skender used compensatory time to continue her paychecks for the first month of her leave, but since approximately April 2008 has been on unpaid leave.

116.    She has thus suffered substantial loss of pay and other benefits throughout her leave period.  On information and belief, this time off will further adversely affect her chances of transfer and/or promotion in the future.

117.    Plaintiff Skender has considered having more children in the future, but has been discouraged from doing so by the DPD policies and practices.

### Julie Krupinski

118.    Plaintiff Krupinski is a thirty-three year old female.

119.    Plaintiff Krupinski began working with DPD in or around September 1996.

120.    At times relevant here, Plaintiff Krupinski was a patrol officer.

121.    At all times, Plaintiff Krupinski has performed work for DPD in a manner that is satisfactory or better.

122.    In February 2006, Plaintiff Krupinski voluntarily reported her pregnancy to her supervisor.  She was then instructed to bring a doctor's note giving her due date and was summarily placed on leave through that date.  She was never evaluated for her ability to perform her job.

123.    During her leave, Plaintiff Krupinski used her banked sick time and was unpaid for several months.  She lost her own medical coverage and had to rely on her husband's coverage.

124.    Plaintiff Krupinski returned to DPD in March 2007.

125.    In September 2007, Plaintiff Krupinski voluntarily reported her pregnancy to her supervisor.  She was then instructed to bring a doctor's note giving her due date and

was summarily placed on leave through that date. She was never evaluated for her ability to perform her job.

126.     Plaintiff Krupinski returned to DPD on or around October 13, 2008.

127.     Plaintiff Krupinski filed charges of discrimination with the EEOC in November 2007. She received a Right to Sue Letter on or about December 1, 2008.


**Count 1**
**Violation of Title VII – Disparate Impact**

128.     Plaintiffs hereby incorporate by reference Paragraphs 1 through 127 above.

129.     Defendants maintain a policy of preferentially assigning light-duty assignments to officers with work-related physical limitations, i.e., injuries or illnesses contracted on the job.

130.     In operation, Defendants' policy imposes a disparate impact on the basis of sex (pregnancy) as to Plaintiffs and all women employed at DPD, in violation of Title VII.

131.     Furthermore, other less restrictive policies/practices are available which would not cause such disparate impact, and Defendants refuse to adopt them.

132.     As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiffs have sustained loss of earnings, earning capacity, fringe benefits, promotional opportunities, and overtime and shift differential pay, and have suffered mental distress, physical and emotional distress, humiliation and embarrassment, and loss of professional reputation.


**Count 2**
**Violation of Title VII – Disparate Treatment**

133.     Plaintiffs hereby incorporate by reference Paragraphs 1 through 132 above.

134.    Defendants have excluded and continue to exclude Plaintiffs from the following benefits, among others, although these benefits are afforded to non-pregnant employees:

    a.    Offering light duty assignments as necessitated by physical limitations;

    b.    Permitting paid leave as necessitated by physical limitations;

    c.    Disregarding leave incurred as a result of physical limitations in determining seniority, benefits, promotion opportunities, and pay;

    d.    Granting overtime and other pay differentials.

135.    Defendants have also forced one or more of the Plaintiffs onto unpaid leave, notwithstanding that such Plaintiffs could perform all of their assigned tasks without any accommodation such as a light duty work assignment, thereby denying these Plaintiffs all of the benefits of continuing employment.

136.    In all cases, Plaintiffs' sex (pregnancy) was a factor that made a difference in the Defendants' actions.

137.    Defendants' actions constitute intentional discrimination against Plaintiffs on the basis of sex (pregnancy) in violation of Title VII.

138.    As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiffs have sustained loss of earnings, earning capacity, fringe benefits, promotional opportunities, and overtime and shift differential pay, and have

suffered mental distress, physical and emotional distress, humiliation and embarrassment, and loss of professional reputation.

**Count 3**
**42 U.S.C. § 1983**
**Denial of Equal Protection Rights Guaranteed by the U.S. Constitution**

139.   Plaintiffs hereby incorporate by reference Paragraphs 1 through 138 above.

140.   Plaintiffs had a right to fair and equal treatment under the law regardless of their sex, as guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

141.   Defendants, by and through their agents and acting under color of law, intentionally singled out and treated Plaintiffs less favorably than males, without a legitimate, important or compelling interest for that treatment.

142.   The discrimination on the basis of gender described more fully above represents official policy and practice of and is attributable to Defendants.

143.   It would have been plainly obvious to a reasonable policymaker that such discrimination did deprive or would lead to deprivations of Plaintiffs' constitutional rights.

144.   Upon information and belief, Defendants' policymaking officials nevertheless agreed to, approved, and ratified this unconstitutional conduct.

145.   On information and belief, Defendants further failed to train their employees in the legal and appropriate methods for assigning light duty assignments, knowingly or with reckless disregard or deliberate indifference to the likelihood that this failure would result in violation of Plaintiffs' constitutional rights.

146. On information and belief, Defendants, by and through their agents and policy-making officials, also failed to intervene in a custom of violating Plaintiffs' constitutional rights.

147. Acting under color of law, Defendants promulgated and/or carried out the official policies, orders and directives described above intentionally and deliberately, with wanton and reckless disregard for the civil and constitutional rights, privileges and sensibilities of Plaintiffs.

148. As a direct and foreseeable consequence of Defendants' policy decisions, failure to train and failure to intervene when a custom of constitutional violations was occurring, Plaintiffs were deprived of their rights under the Fourteenth Amendment to the United States Constitution.

## Relief Requested

For all of the foregoing reasons, Plaintiffs demand judgment against Defendants as follows:

**A. Legal Relief:**

1. Compensatory damages in whatever amount they are found to be entitled;

2. Punitive and exemplary damages in whatever amount they are found to be entitled;

3. A judgment for lost wages and benefits, past and future, in whatever amount they are found to be entitled; and

4. An award of interest, costs and reasonable attorney fees.

**B. Equitable Relief:**

1. An order reinstating Plaintiffs to the positions, seniority status, longevity status and other designations they would have received had there been no wrongdoing by Defendants;

2.     An order declaring that Defendants' policy, as written and as applied to Plaintiffs, violates Plaintiffs' rights under Title VII and the Equal Protection Clause of the United States Constitution;

3.     An injunction prohibiting Defendants from enforcing any discriminatory policies against Plaintiffs or other pregnant police officers in the future, and prohibiting any further acts of discrimination or deprivations of constitutional rights;

4.     An award of interest, costs and reasonable attorney fees; and

5.     Whatever other equitable relief appears appropriate at the time of final judgment.

Deborah L. Gordon, PLC
s/Sarah S. Prescott (P70510)
Deborah L. Gordon (P27058)
Sharon Dolente (P67771)
Cooperating Attorneys, American Civil
    Liberties Fund of Michigan
33 Bloomfield Hills Parkway, Suite 275
 Bloomfield Hills Michigan 48304
Telephone 248 258 2500
sprescott@deborahgordonlaw.com
dgordon@deborahgordonlaw.com
sdolente@deborhagordonlaw.com

/s Michael J. Steinberg
Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Jessie Rossman (admission pending)
American Civil Liberties Union Fund
    of Michigan
2966 Woodward Avenue
Detroit, MI 48201
Telephone 313 578 6814
msteinberg@aclumich.org
jrossman@aclumich.org

Dated: February 24, 2009

**TISHA PRATER, ANGELICA**
**ROBINSON, SHA-MAR WOODS,**
**KELLY LUCY and JAMICA SKENDER,**

      Plaintiffs,

vs.                                                 **CASE NO.**

**DETROIT POLICE DEPARTMENT** and the
**CITY OF DETROIT,** *a municipality*, *jointly*       **HON.**
*and severally.*

      Defendants.
_____

Deborah L. Gordon, PLC
Deborah L. Gordon (P27058)
Sarah S. Prescott (P70510)
Sharon Dolente (P67771)
Cooperating Attorneys, American Civil
  Liberties Union
Attorneys for Plaintiffs
33 Bloomfield Hills Parkway, Suite 275
Bloomfield Hills Michigan 48304
Telephone 248 258 2500
dgordon@deborahgordonlaw.com
sprescott@deborahgordonlaw.com
sdolente@deborahgordonlaw.com

Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Jessie Rossman (admission pending)
Attorneys for Plaintiffs
American Civil Liberties Union Fund
  of Michigan
2966 Woodward Avenue
Detroit, MI 48201
Telephone 313 578 6814
msteinberg@aclumich.org
jrossman@aclumich.org

## JURY DEMAND

Plaintiffs, by and through their attorneys, demand a trial by jury of all the issues in this case.

Deborah L. Gordon, PLC
s/Sarah S. Prescott (P70510)
Deborah L. Gordon (P27058)
Sharon Dolente (P67771)
Cooperating Attorneys, American Civil
  Liberties Union Fund of Michigan
33 Bloomfield Hills Parkway, Suite 275
 Bloomfield Hills Michigan 48304
Telephone 248 258 2500
dgordon@deborahgordonlaw.com
sprescott@deborahgordonlaw.com
sdolente@deborahgordonlaw.com

/s Michael J. Steinberg
Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Jessie Rossman (admission pending)
American Civil Liberties Union Fund
  of Michigan
2966 Woodward Avenue
Detroit, MI 48201
Telephone 313 578 6814
msteinberg@aclumich.org
jrossman@aclumich.org

Attorneys for Plaintiffs

Dated: February 24, 2009